UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

----------------------------------------------x

JOSE RODRIGUEZ

                                      Civil Action No.  04-11894-RGS

                Petitioner,

vs.

MCI NORFOLK,

                Respondent.

----------------------------------------------x

## RESPONDENT'S MEMORANDUM OF LAW
## IN OPPOSITION TO PETITIONER'S PETITION FOR
## <u>WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2254</u>

### <u>INTRODUCTION</u>

The respondent hereby submits this memorandum in opposition to the petition for writ of habeas corpus filed by Jose Rodriguez ("the petitioner").  As set forth below, the petition pursuant to 28 U.S.C. § 2254 should be denied where certain of the petitioner's habeas claims are in procedural default and where the Massachusetts Appeals Court's decision resolving the petitioner's claims against him was neither contrary to, nor an unreasonable application of, clearly established Federal law, as determined by the Supreme Court.

### <u>STATEMENT OF THE CASE</u>

**I.**       **State Court Trial and Direct Appeal**

On July 23, 1996, the petitioner was indicted in the Suffolk County Superior Court on the charges of assault and battery with a dangerous weapon and of murder in the first degree.  *See* Docket Sheet for Suffolk County Criminal Action No. 1996-11119 (hereinafter, "Docket Sheet"), attached to the Supplemental Answer ("Supp. Ans."), filed previously, as Exhibit 1.

On October 2, 1997, the petitioner was found guilty of the lesser included offense of murder in the second degree. *See id.* The petitioner was sentenced to state prison for life. *Id.*

On October 22, 1997, the petitioner filed a timely notice of appeal. *Id.* As grounds for his appeal, the petitioner asserted (1) that the trial court abused its discretion by admitting into evidence a statement which the petitioner made prior to the killing; (2) that the court gave erroneous instructions on manslaughter and reasonable doubt; (3) that the court "should direct the entry of a lesser degree of guilt of manslaughter in the interests of justice"; and (4) that "the prosecutor unfairly commented in the summation in violation of due process." *See* Brief and Record Appendix for the Defendant/Appellant, Supp. Ans., Exhibit 2; Supplemental Brief for the Defendant/Appellant, Supp. Ans., Exhibit 3. On October 21, 1999, the Massachusetts Appeals Court affirmed the judgment of the Superior Court. *See Commonwealth v. Rodriguez*, 48 Mass. App. Ct. 1104 (1999)(table), reproduced in Supp. Ans., Exhibit 5.

The petitioner subsequently filed an Application for Further Appellate Review ("ALOFAR") with the Massachusetts Supreme Judicial Court ("the SJC"). As grounds for his ALOFAR, the petitioner asserted that his rights had been violated (1) by the admission into evidence of a statement he made prior to the confrontation which resulted in the victim's death; (2) by remarks made by the prosecutor in his closing argument; and (3) by allegedly erroneous jury instructions. Supp. Ans., Exhibit 6. The SJC denied the ALOFAR on January 7, 2000. *Commonwealth v. Rodriguez,* 430 Mass. 1114 (2000)(table), reproduced in Supp. Ans., Exhibit 7.

## II.    Motion for a New Trial

On December 19, 2000, the petitioner filed a motion for a new trial in the Superior Court.

*See* Docket Sheet, Supp. Ans., Exhibit 1; *see also* Supp. Ans., Exhibit 8.  As grounds for his motion for a new trial, the petitioner asserted that he had been denied effective assistance of counsel where (1) counsel presented a defense of self-defense, even though, the petitioner asserted, the evidence did not support such a defense; (2) counsel permitted the petitioner to give testimony which was in conflict with the testimony given by other witnesses; (3) counsel advised the petitioner to decline an offer to plead guilty to the charge of manslaughter; (4) counsel failed to hire an investigator to look into the petitioner's version of the facts; (5) counsel failed to file a post-trial motion asserting that the evidence at trial more fairly supported a verdict of manslaughter (rather than second-degree murder); and (6) counsel failed to object to the court's "consciousness of guilt" instruction to the jury.  *See* Memorandum of Law in Support of Motion for New Trial or for Relief Under Mass. R. Crim. P. 25(b)(2), Supp. Ans., Exhibit 9.  The petitioner also asserted that he had been denied the effective assistance of appellate counsel and that it was error for the court to have given the challenged "consciousness of guilt" jury instructions.  *See id.*  On March 29, 2002, the Superior Court judge, who had also been the trial judge, denied the motion, stating: "The evidence does not warrant a reduction to manslaughter.  I refuse to address any of the other grounds asserted in this motion on the merits, as they have been waived by the [petitioner's] failure to raise them in the original appeal.  Motion denied without a hearing."  Supp. Ans., Exhibits 1, 10.

The petitioner appealed the denial of his new trial motion to the Massachusetts Appeals Court on April 10, 2002.   On May 4, 2004, the Appeals Court denied the petitioner's appeal, stating:

> We have examined the [petitioner's] claims of error concerning the judge's instructions to the jury as well as his newly framed argument that trial counsel's failure to object to the instructions amounts to ineffective assistance of counsel.
>
> As the motion judge, who was also the trial judge, indicated in denying the [petitioner's] motion for new trial without an evidentiary hearing, all of the issues have been waived (R.5), since they could have been presented in the direct appeal and were not. *See Commonwealth v. Kilburn,* 438 Mass. 356, 360 (2003). Even if there were error in the consciousness of guilt instruction, a proposition of doubtful validity, our review of the record indicates that there was no substantial risk of a miscarriage of justice. *Commonwealth v. Curtis*, 417 Mass 619, 623-26 (1994). There is correspondingly no possible claim for ineffective assistance of counsel. *Id.* at 624-625 n.4.

*Commonwealth v. Rodriguez,* 61 Mass. App. Ct. 1102 (2004)(table), Supp. Ans., Exhibit 13.

The petitioner filed an Application for Leave to Obtain Further Appellate Review of the Appeals Court's decision on May 14, 2004. Supp. Ans., Exhibit 14. The SJC denied the application for further appellate review on June 30, 2004. Supp. Ans., Exhibit 15.

## III.    The Instant Habeas Petition

The petitioner filed the habeas petition now before this Court on or about August 30, 2004. As grounds for his petition, the petitioner asserts (1) that his conviction was obtained in violation of his constitutional rights to a fair trial and due process of law because of the trial court's allegedly erroneous admission of a statement made by the petitioner prior to the confrontation which resulted in the victim's death (Ground One); (2) that his conviction was obtained in violation of his constitutional right to due process of law because the prosecutor allegedly made an improper comment about a witness' testimony (Ground Two); (3) that his conviction was obtained in violation of his constitutional right to due process because the judge allegedly gave the jury "defective" instructions regarding manslaughter and reasonable doubt (Ground Three); (4) that his conviction was obtained in violation of his constitutional right to be

free from compelled self-incrimination because the judge gave the jury an allegedly

unconstitutional instruction on the issue of flight (Ground Four); (5) that his conviction was

obtained in violation of his constitutional right to due process because the "flight" instruction

allegedly impermissibly shifted the burden of proof to the petitioner (Ground Five); (6) that his

conviction was obtained in violation of his constitutional right to due process because the

"flight" instruction allegedly "facilitated a finding of malice founded upon baseless inference"

(Ground Six); and (7) that his conviction was obtained in violation of his constitutional right to

the effective assistance of counsel because both trial counsel and appellate counsel failed "to

object to, raise, and argue the prejudicial impact of the State trial court's unconstitutional 'flight'

instruction" (Ground Seven).

## STATEMENT OF FACTS

A state court's determination of facts is entitled to a presumption of correctness under 28

U.S.C. § 2254(e)(1). *See Coombs v. Maine*, 202 F.3d 14, 18 (1st Cir. 2000); *Avellar v. DuBois*,

30 F.Supp.2d 76, 79 (D.Mass. 1998); *Otsuki v. DuBois*, 994 F.Supp. 48, 51 & n.3 (D.Mass.

1998); *cf. Sumner v. Mata*, 449 U.S. 539, 545-46 (holding that the presumption of correctness

under former habeas statute applied to "factual determinations made by state courts, whether the

court be a trial court or appellate court"), 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). A reviewing

habeas court reviews the facts "in the light most favorable to the jury's verdict, consistent with

record support." *United States v. Gonzalez-Vasquez*, 219 F.3d 37, 40 (1st Cir. 2000). This

deference extends to inferences drawn by the state court from those factual determinations as

well. *See Parke v. Raley*, 506 U.S. 20, 35, 113 S.Ct. 517, 121 L.Ed.2d 391 (1992); *Flores v.

Marshall*, 53 F.Supp.2d 509, 514 (D.Mass. 1999). A petitioner seeking to overturn a state

court's factual determination has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

The facts regarding the crime of which the petitioner was convicted are as follows[1]:

A.     The Commonwealth's Case

In the early morning hours of July 7, 1996, the petitioner fatally stabbed the victim, Victor Paulino, during a fight at Revere Beach.[2] (Trial Transcript Volume II:69, 74-76, 130-132; III:16-20, 96-97, 165-171). The following events led up to the fatal attack:

At about 10:00 P.M. on the evening of July 6, 1996, Yissell Dilone, the petitioner's girlfriend, drove the petitioner to the Cache Club in Lynn. (II:112, 117). The petitioner worked there collecting the cover charge from patrons. (II:11-12). The petitioner had previously told Dilone that he had had an argument at the Cache Club with a patron who did not want to pay the cover charge. (II:11-12, 26-27, 145-147). The petitioner had referred to the person as "Suldo," which means "left hand" in Spanish. (II:145-147). The victim's nicknames were "Suldo" and "Lefty." (II:12-13, 27-28, 37, 66, 113-114).

At the Cache Club that night, the petitioner worked with Juan Reyes and Pedro Subervi. (II:9-10, 25-26, 38). Between 11:30 and 12:30, the victim arrived at the club. (II:12-13, 27-28, 67, 156-157). The victim asked the petitioner, "Why do I have to pay seven dollars?" (II:13).

---

[1] These facts are drawn from the Brief for the Commonwealth in the appeal entitled *Commonwealth v. Jose Rodriguez,* Massachusetts Appeals Court No. 1998-P-1091, Supp. Ans., Exhibit 4, and from the Brief for the Commonwealth on the appeal of the denial of the petitioner's new trial motion, captioned *Commonwealth v. Jose Rodriguez*, Massachusetts Appeals Court No. 2002-P-0573, Supp. Ans., Exhibit 12.

[2] In citations to the trial transcript, volume numbers appear as Roman numerals; the page numbers follow.

The petitioner replied that he was doing his job. (II:13). The victim became angry, and told the petitioner, "he didn't know who he [the victim] was." (II:13, 28-29). The victim also said that he could "break" the petitioner and could "blow him away."[3] (II:13-14, 29). The petitioner told the victim had "to respect him," and "that he was a man." (II:14). The petitioner attempted to leave the booth (in which he was working while collecting the cover charges), but his co-worker Reyes prevented him from exiting. (II:14, 29). The victim paid the seven dollar cover charge. (II:17).

One of the owners of the club, Jesus Manzueta, saw the exchange between the victim and the petitioner. (II:16-17, 29, 37-41). Manzueta, knowing that the victim was a regular at the club, asked the victim about the exchange. (II:16-17, 29, 37, 41-43). The victim replied, "No, no, it's okay." (II:43). Manzueta told the victim that he "wanted to be sure that there weren't going to be any problems." (II:43). The victim responded, "No, no, there won't be any problem." (*Id.*) The victim did not appear to be angry. (*Id.*)

Later that night, the victim's close friend Geysi Heredia arrived at the club. (II:44, 67, 98). Manzueta pulled Heredia aside, told him about the exchange, and told him to speak to the victim "just to make sure" that there were no more problems." (II:44-45, 67). Heredia testified that he spoke to the victim and that the victim was "happy that night." (II:67).

Between 11:00 and 11:30 P.M., the petitioner's girlfriend, Dilone, and two of her friends, Roseanna Quezada and Damaris Mercedes, arrived at the Cache Club. (II:118, 182). Dilone

---

[3] There was testimony at trial that to tell someone that one can "break" him is an expression considered offensive in Spanish. (II:23). Likewise, there was testimony that to suggest that one would "blow" someone away is a similarly offensive expression, and does not intimate using a weapon. (II:31).

brought the petitioner a bottle of Johnny Walker to drink while he was working in the booth. (II:120-121).

At about 11:30 P.M., Yoanne Ledesma, a friend of the victim's, arrived at the Cache Club. (III:73). Between 1:30 and 1:45 A.M., Ledesma overheard the petitioner talking to two other men near the entrance of the club. (III:74-75). She heard the petitioner say, "they were going to see that one of these days he was going to kill one of those guys." (III:79).

After the club closed, Dilone, Mercedes, and the petitioner left in Dilone's white Nissan Altima, and the petitioner drove to Kelly's Roast Beef in Revere. (II:121-122, 183-184). The petitioner was yelling at Dilone while he drove. (II:122, 125). After arriving at Kelly's, Dilone and Mercedes got in line to place an order. (I:127, 187). Also at Kelly's were Heredia, the victim, and two friends (Ledesma and Carlos Acevedo). (III:6-7, 79).

The petitioner approached Heredia and the victim and told the victim that he was "fresh." (II:70-72). The victim either did not respond (II:72) or called the petitioner a rude name.[4] (II:128, 171). The petitioner then told the victim that he had to "respect men." (II:72). The victim only smiled. (II:73). The petitioner told the victim that "they could resolve it right now" or they could "solve this like men," and that they could go over there and fight." (II:73; III:10-11). Heredia told the victim and petitioner that they should go across the street to the beach to fight. (II:128; III:11).

The petitioner and the victim walked across the street to the beach.[5] (II:73-74, 128, 188;

---

[4] Dilone testified that she heard the victim call the petitioner an obscene name. (II:128, 171). Heredia testified that the victim did not respond to the petitioner. (II:72).

[5] Dilone, Mercedes, Acevedo, and Ledesma all testified that only the victim and the
(continued...)

III:12, 79-80).  Heredia stayed at Kelly's and got in line to order food.  (II:74).  Dilone, Mercedes, and Acevedo went to the beach to watch the fight. (II:128-129; III:13-15).

At the beach, the victim and the petitioner were standing in the sand "at a distance . . . people get when they're going to fight." (III:15).  They then began swinging punches at each other.  (II:129, 189-190).  Dilone saw the petitioner remove a knife from his back pants pocket. (II:129-130).   The petitioner wrapped his black jacket around the hand holding the knife, and "stuck [the knife] in . . . the victim's stomach."[6] (II:129-131).  Carlos saw the victim and the petitioner move close together, so that it looked like "they were stuck together," and then saw the petitioner quickly draw his right hand back. (III:15-17).  After that, the victim "held onto his chest."  (III:16-17).  The victim "walked back towards a wall" and fell onto the sand.  (II:132, 190-191; III:19).   He did not have anything in his hands. (II:132).

Acevedo asked the victim "what's the matter," but the victim did not respond. (III:17). Instead, the victim addressed the petitioner and cried, "Why did you do that? You weren't supposed to do that.  You shouldn't have done that." (*Id.*)  The petitioner responded, "You take that.  I told you not to mess with me, not to pick on me." (III:18).

Meanwhile, Heredia, still standing in line at Kelly's, heard someone scream, "Lefty got stabbed." (II:74).   Heredia ran to the beach. (*Id.*).  When he arrived, he saw the petitioner standing next to the victim. (II:75).  The victim told Heredia, "I'm stabbed." (*Id.*).  Heredia saw the petitioner holding a knife in his right hand.  (II:76).   Heredia approached the petitioner. (*Id.*).

---

[5] (...continued)
petitioner crossed the street to fight on the beach.  (II:73-74, 128, 188; III:12, 79-80).

[6] Dilone was the only witness who testified that the petitioner wrapped his jacket around his hand. (II:129-131).

The petitioner raised the knife and brandished it towards Heredia or waived it back and forth at him.[7] (II:77-78, 131).  Backing up, Heredia grabbed some sand and threw it at the petitioner. (II:78, 132, 191-192).  The sand also landed on Dilone and Mercedes, who were both standing next to the petitioner. (II:133, 191-192).  Mercedes asked the petitioner what he was doing, and the petitioner answered that they had jumped him and that they shouldn't have messed with him. (II:193).  Dilone did not see anything in Heredia's hands before he threw sand at the petitioner. (II:132).

The petitioner, Dilone, and Mercedes ran across the street to the white Altima. (II:132-133, 195; *see also* II:78-79; III:18).  Mercedes got into the driver's seat and the petitioner got into the front passenger seat.  (II:133).  Heredia, running after the petitioner, reached the automobile and started kicking at the passenger side window.  (II:79, 102, 133-134, 196; III:82). Dilone grabbed Heredia by his shirt and tried to stop him from hitting the automobile. (II:80-82, 134-135; III:82).  Mercedes sped away.  (II:83, 196).  Mercedes asked the petitioner what happened at the beach, and the petitioner repeated that they shouldn't have been messing with him. (II:197).

State Police Sergeant Jeffrey Dooling was driving past Kelly's when he saw Heredia lifting up Dilone, "ready to slam her down on the ground." (III:44).  Dilone was "clawing" at Heredia's face. (III:44-45).  When Sergeant Dooling polled over, Heredia immediately put Dilone down and ran to the cruiser with another man. (II:84, 135; III:45).  The men told Sergeant

_____

[7] Dilone testified that the first time she noticed Heredia at the scene was when the petitioner waived his knife at him. (II:131).  She testified that she did not see a knife in Heredia's or the victim's hands.  (II:132).  On cross-examination, Dilone admitted that she had lied in her first statement to the police, giving a version of the fight that was more favorable to her boyfriend. (II:166-172).

Dooling that their friend had been "stabbed or shot." (III:45).  Other people crowding around the cruiser pointed to the white Nissan Altima that was speeding away. (*Id.*)  Sergeant Dooling followed the Nissan. (II:85, 135; III:46).  State Police Trooper Damian Halfkenny responded to the scene at Kelly's. (III:89-91).  At the beach he sw the victim lying on his back, bleeding from his chest.  (III:91-92).  The victim did not respond to any of the trooper's questions, and the trooper could not locate a pulse. (III:92-93).  The trooper performed CPR on the victim with the assistance of a nurse who happened to be at the scene.  (III:93).  Their attempts at reviving the victim were unsuccessful. (*Id.*)  An ambulance arrived to transport the victim to a hospital.  (III:94, 96).  The victim was pronounced dead at some time before 3:30 A.M. (III:97-97).

Sergeant Dooling pulled over the Nissan at 1090 North Shore Road.  (III:46, 95).  He ordered the petitioner out of the automobile and conducted a pat-frisk, which revealed no weapons. (III:48-49).  At that point he received the radio call from Trooper Halfkenny stating that there was a stabbing victim at Revere Beach and giving a description of the suspect. (III:49).  The petitioner fit the description given in the radio call. (*Id.*)  Trooper Dooling radioed Trooper Halfkenny and said that he had the suspect in custody. (III:49, 95).  Sergeant Dooling handcuffed the petitioner and put him in the rear of his cruiser. (III:49-50).

Sergeant Dooling then secured the Nissan. (III:54-55).  The Nissan was towed to the Revere Beach Barracks (III:60), where Lieutenant Brian O'Hara and Sergeant Dooling later removed a knife from the car pursuant to a search warrant. (III:148-149, 151).  Dilone and Mercedes testified that the knife was the petitioner's and that they had seen him with it before the night of the stabbing. (II:139, 209).

Doctor Leonard Atkins, a Suffolk County Medical Examiner, performed an autopsy on

the victim's body. (III:165).  The stab wound was located in the upper right portion of the

victim's chest.  (III:165-166, 172).  The wound had caused massive bleeding, leading to shock

and then death.  (III:171).  A knife, or an instrument used as a knife, had caused the wound.

(III:168-169).  The petitioner's knife could have caused the wound. (III:168-169).  It would have

required a "severe degree of force" for the knife to penetrate the body as far as it did. (III:169-

170).

        B.     *The Petitioner's Case*

The petitioner admitted that he was carrying a knife on the night of the incident, and that

he "always" carried a knife for protection. (III:191).  He testified that, on the night in question,

the victim tried to enter the club without paying. (III:193-194).  When the victim was told he had

to pay, he called the petitioner a "cock sucker" and said, "You don't know who I am.  Wherever

I see you, I can explode you." (III:194).  The petitioner told the victim that he had to respect him.

(*Id.*)  He also tried to leave the booth in order to give the victim his money back. (III:195).  The

petitioner wanted to prevent the victim from entering the club because he had been

"disrespectful" to him. (*Id.*)   Roberto, another worker at the Cache Club, prevented the

petitioner from leaving the booth. (*Id.*)

The petitioner testified that later that night the victim and Heredia approached him at

Kelly's. (III:204).  The victim said "now we are on the street." (*Id.*)  The petitioner explained to

the victim that he was just doing his job. (*Id.*)  Heredia then told the victim to "take [the

petitioner] over to the sand to fight." (III:204-205).  According to the petitioner, the victim poked

12

him in the chest,[8] and asked him if he wanted to go to the sand to fight. (III:205).  The petitioner

said that he did not want any problems, but the victim again asked him if he wanted to fight. (*Id.*)

The petitioner told the victim "if that's your wish, okay.  Let's fight." (*Id.*)

The petitioner followed the victim to the beach, and Heredia followed the petitioner.

(III:205).  When they got to the sand, the victim threw a punch at the petitioner, who stepped

back. (*Id.*).  According to the petitioner, at that point Heredia appeared and threw sand in his

face.  (*Id.*).  The petitioner said, "Oh, it's both of you." (*Id.*).  He took out his knife and "started

moving it from left to right." (III:205-206, 208).  He told them, "Don't come close to me."

(III:206).  He testified that he then "got a punch in the chest, and, at that moment, I felt an impact

on my hand." (*Id.*).  Heredia then threw sand at him again. (*Id.*).  The petitioner ran up the stairs

away from Heredia. (*Id.*).  He ran to the Nissan, got into the automobile with Mercedes, and

drove off. (*Id.*).  He closed the knife, and put it underneath his seat. (III:208).

C.    *The Consciousness of Guilt Instruction*

The trial judge, the Hon. Robert Mulligan, gave the following instruction to the jury, at

the Commonwealth's request (III:225-226):

> You heard evidence in this case that after the incident, if I could refer to it that way,
> on the beach this defendant fled the scene.  If the Commonwealth has established the
> defendant did attempt to flee, you may consider whether such flight indicates
> feelings of guilt on his part and whether, in turn, such feelings of guilt might tend to
> show actual guilt of the charge against him.
>
> You are not required to draw such inferences and you should not do so unless they
> appear to be reasonable in light of all of the circumstances in the case.  If you decide

---

[8] The petitioner testified that the victim "goes like this to me on the chest." (III:205).
Later, during the discussion on jury instructions, defense counsel indicated that during his
testimony the petitioner had demonstrated that the victim put his fingers into the petitioner's
chest. (III:229).  The trial prosecutor agreed with the defense attorney. (III:230).

that such inferences are reasonable, it is up to you to decide how much importance or weight to give them; but you should consider that there may be reasons why an innocent person might flee.  Such conduct does not necessarily reflect feelings of guilt for such feelings are present in innocent people.

But the cardinal rule is never convict anyone on evidence of consciousness of guilt, standing alone.  You may consider it with all the other evidence in reaching your verdict.  So, again, if you are to determine that such flight did demonstrate feelings of guilt, you may consider that; but you also must consider that feelings of guilt are often present in innocent persons; and you never convict anyone on evidence of consciousness of guilt, standing alone.

(IV:69-70).

## ARGUMENT

I.    **THE PETITIONER'S CLAIM FOR RELIEF ON GROUNDS FOUR, FIVE, SIX AND SEVEN OF HIS PETITION IS BARRED BY THE DOCTRINE OF PROCEDURAL DEFAULT.**

Review of the claims asserted in Grounds Four, Five, Six and Seven of the habeas

petition is precluded by the procedural default rule.  *See Brewer v. Marshall*, 119 F.3d 993, 999

(1st Cir. 1997), *cert. denied,* 522 U.S. 1151 (1998).  The Appeals Court clearly found that these

claims had been waived by the petitioner's failure to raise them in his direct appeal.[9]  *See*

*Commonwealth v. Rodriguez,*  61 Mass. App. Ct. 1102 (2004)(table), Supp. Ans., Exhibit 13.

---

[9] The petitioner argues that even if the claims raised in Grounds Four, Five and Six are deemed properly waived, the claim in Ground Seven (ineffective assistance of counsel) cannot be waived because a claim for ineffective assistance of counsel which is brought in a first motion for new trial is not waived under Massachusetts law.  While the petitioner's proposition holds true as a general rule, the petitioner overlooks the exception to the rule, which applies in his case.  Massachusetts courts have held that a claim of ineffective assistance of counsel is waived if not brought on direct appeal in cases where a person has different counsel on appeal than he did at trial.  *See Commonwealth v. Chase,* 433 Mass. 293, 298-99 (2001); *Commonwealth v. Lanoue*, 409 Mass. 1, 3-4 (1990).  *See also Commonwealth v. Cruz*, 62 Mass. App. Ct. 1109 (2004)(table), 2004 WL 2495614.  The petitioner indisputably had different counsel at trial and on appeal. *See* Petition, ¶¶ 9(a-e).  Accordingly, the motion judge correctly determined that under Massachusetts law the petitioner's ineffective assistance of counsel claim had been waived because it was not brought on direct appeal.

Procedural default is an "adequate and independent state law ground" which is separate from the constitutional challenge, and thus this decision should not be reviewed by this Court. *See Brewer*, 119 F.3d at 999.

The Supreme Court has held that in the interests of comity and federalism, a habeas court should "not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Boutwell v. Bissonnette*, 66 F.Supp.2d 243, 245 (D. Mass. 1999), *quoting Coleman v. Thompson*, 501 U.S. 722, 729 (1991). Such independent and adequate state grounds exist where, as here, "the state court declined to hear [the federal claims] because the prisoner failed to meet a state procedural requirement." *Simpson v. Matesanz*, 175 F.3d 200, 206 (1st Cir. 1999), *cert. denied*, 528 U.S. 1082 (2000), *quoting Brewer,* 119 F.3d at 999. *See also Coleman,* 501 U.S. at 729 (noting that the rule of preclusion applied to both substantive and procedural state law rulings)*; Burks v. Dubois*, 55 F.3d 712, 716 (1st Cir. 1995)("The habeas corpus anodyne is designed neither to provide an additional layer of conventional appellate review nor to correct garden-variety errors, whether of fact or law, that may stain the record of a state criminal trial. Rather, the remedy is limited to the consideration of federal constitutional claims").

"[T]he application of the independent and adequate state ground doctrine is grounded in concerns of comity and federalism. Without the rule, a federal district court would be able to do in habeas what [the U.S. Supreme Court] could not do on direct review; habeas would offer state prisoners whose custody was supported by independent and adequate state grounds an end run around the limits of [the Supreme Court's] jurisdiction and a means to undermine the State's interest in enforcing its laws." *Coleman*, 501 U.S. at 730.

15

The petitioner argues that the procedural default rule should not apply to his claims, asserting that his claims are not defaulted because the Appeals Court considered the claims asserted in Grounds Four through Seven of his habeas petition on their merits.  This argument fails, however, because the Appeals Court did not review the petitioner's claims on the merits but rather, after noting that the motion judge correctly determined that the issues had been waived, stated that, in the alternative, the petitioner's claims would not have survived because they did not present "a substantial risk of a miscarriage of justice." *See Commonwealth v. Rodriguez*, 61 Mass. App. Ct. at 1102, Supp. Ans., Exhibit 13.  The fact that the Appeals Court considered an alternative reason for upholding the motion judge's decision does not provide a "good reason to question whether there is an independent and adequate state ground for the decision." *See Coleman v. Thompson*, 501 U.S. at 729.  A "state court need not fear reaching the merits of a claim in an *alternative* holding.  By its very definition, the adequate and independent state ground doctrine requires a federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state also relies on federal law . . . . In this way, a state court may reach a federal question without sacrificing its interests in finality, federalism, and comity." *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989)(internal citations omitted).

To overcome this procedural default to permit federal habeas review, the petitioner must demonstrate either (1) cause and prejudice for the default, or (2) that a failure to review the claim will result in a "fundamental miscarriage of justice," *i.e.*, the conviction of an innocent person. *Coleman v. Thompson*, 501 U.S. at 750.  In this case, the petitioner cannot demonstrate either. The fact that the petitioner's trial and appellate counsel failed to raise the arguments presented in Grounds Four through Seven in the direct appeal does not establish cause to excuse this

16

procedural default. *See Murray v. Carrier*, 477 U.S. at 486 (counsel's failure to recognize a claim or failure to raise a recognized claim does not constitute "cause"); *Engle v. Isaac*, 456 U.S. at 134 (counsel's alleged unawareness of objection not sufficient to constitute "cause"). The petitioner suggests no other "cause" for failing to raise these claims on his direct appeal.

Furthermore, even if the petitioner could demonstrate "cause" for his defaults, he cannot demonstrate that he would suffer the genre of prejudice required to excuse those defaults, namely, that the alleged errors "infect[ed] his entire trial with error of constitutional dimensions." *Ortiz v. DuBois*, 19 F.3d 708, 714 (1st Cir. 1994), *cert. denied*, 513 U.S. 1085 (1995), quoting *United States v. Frady*, 456 U.S. 152, 170 (1982). As is set forth in detail in the Commonwealth's Brief on the appeal of the denial of the new trial motion, the "flight" or "consciousness of guilt" instruction was proper and necessary; the instruction did not violate the petitioner's right against self-incrimination; and the instruction did not shift the burden of proof from the Commonwealth to the petitioner. *See* Brief and Supplemental Appendix for the Commonwealth on Appeal from the Suffolk Superior Court, Supp. Ans., Exhibit 12, pp. 17-25, and cases cited therein. Accordingly, the fact that petitioner's trial counsel did not object to the instruction is not a failing that would satisfy either prong of the test for effectiveness of counsel set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Under these circumstances, the petitioner can demonstrate no prejudice rising to the level of error "infecting his entire trial with error of constitutional dimensions.'" *Ortiz v. DuBois*, 19 F.3d at 714.

Finally, the petitioner could make no demonstration to this habeas court that he actually is innocent. "To establish actual innocence, 'petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'"

17

*Simpson v. Matesanz*, 175 F.3d at 210, quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)

(citations omitted).  The Commonwealth produced ample evidence of the petitioner's guilt.  As

such, this "quite narrow and seldom used" exception to the procedural default doctrine simply

does not apply to this case and habeas review of the claims presented in Grounds Four through

Seven is barred by the rule of procedural default.  *Simpson v. Matesanz*, 175 F.3d at 210.

**II.    THE PETITIONER IS NOT ENTITLED TO HABEAS CORPUS RELIEF
        WHERE THE APPEALS COURT'S ADJUDICATION OF HIS CLAIMS WAS
        NOT CONTRARY TO, OR AN UNREASONABLE APPLICATION OF,
        <u>CLEARLY ESTABLISHED SUPREME COURT LAW.</u>**

**A.    <u>Standard of Review</u>**

Since the instant petition was filed after the effective date of the Antiterrorism and

Effective Death Penalty Act ("AEDPA"), this Court's review is governed by that act.  *Lindh v.*

*Murphy*, 521 U.S. 320, 336 (1997).  *See also* 28 U.S.C. § 2254.  AEDPA "places a new

constraint on the power of a federal habeas court to grant a state petitioner's application for a

writ of habeas corpus with respect to claims adjudicated on the merits in state court."  *Williams*

*v. Taylor*, 529 U.S. 362, 412 (2000); *Williams v. Matesanz*, 230 F.3d 421, 426 (1st Cir. 2000)("a

federal [habeas] court operates within a closely circumscribed sphere").  As the Supreme Court

has reiterated, AEDPA requires a "'highly deferential standard for evaluating state-court rulings'

. . . which demands that state court decisions be given the benefit of the doubt."  *Woodford v.*

*Visciotti*, 537 U.S. 19, 23 (2002)(*per curiam*), quoting *Lindh*, 521 U.S. at 333, n.7.  In relevant

part, AEDPA precludes a federal court from granting habeas relief, unless the state court

adjudication "resulted in a decision that was contrary to, or involved an unreasonable application

of, clearly established Federal law, as determined by the Supreme Court of the United States" or

was based on "an unreasonable determination of the facts in light of the evidence presented in

the State court proceeding." *See* 28 U.S.C. §2254(d)(1-2); *see also Tyler v. Cain*, 533 U.S. 656, 660 (2001). In addition, under AEDPA, state court determinations of factual issues "shall be presumed to be correct" unless the petitioner rebuts this "presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Coombs v. Maine*, 202 F.3d 14, 18 (1st Cir. 2000).

      1.      The "Contrary To" Prong

A state court decision is "contrary to" clearly established Supreme Court precedent in only two circumstances: (a) where "the state court applies a rule that contradicts the governing law set forth in" Supreme Court cases or (b) where "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent." *Williams v. Taylor,* 529 U.S. at 405-06. Under either scenario, in order to fall within the "contrary to" clause, the state court decision must be "substantially different," "diametrically different," "opposite in character or nature," or "mutually opposed" to clearly established Supreme Court law. *Id.*

      2.      The "Unreasonable Application Of" Prong

A state court decision involves an "unreasonable application" of Supreme Court precedent "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Williams v. Taylor*, 529 U.S. at 407-09, 413. Merely that the state court reached an incorrect result is not sufficient -- the result also must be unreasonable. *L'Abbe v. DiPaolo*, 311 F.3d 93, 96 (1st Cir. 2002), *citing Williams v. Taylor*, 529 U.S. at 411; *see also McCambridge v. Hall*, 303 F.3d 24, 36-37 (1st Cir. 2002)(en banc)("'some increment of incorrectness beyond error is

required' . . . The increment need not necessarily be great, but it must be great enough to make the decision unreasonable in the independent and objective judgment of the federal court"), *quoting Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000). Where, for instance, the state court reaches a result that is "devoid of record support for its support for its conclusion or is arbitrary," the unreasonable application prong likely will be satisfied. *McCambridge*, 303 F.3d at 37, *citing O'Brien v. DuBois*, 145 F.3d 16, 25 (1st Cir. 1998). *See also Kibbe v. DuBois*, 269 F.3d 26, 35 (1st Cir. 2001), *cert. denied* 535 U.S. 960 (2002); *Hurtado v. Tucker*, 245 F.3d 7, 16 (1st Cir.), *cert. denied* 534 U.S. 925 (2001). In order for a federal habeas court to find that the "unreasonableness" prong has been met, the state court's determination of either the law or the facts must be *objectively* unreasonable. *See Williams v. Taylor*, 529 U.S. at 411; *Williams v. Matesanz*, 230 F.3d at 426-27; *Torres v. Prunty*, 223 F.3d 1103, 1108 (9th Cir. 2000).

There is no bright-line rule as to what constitutes an "objectively unreasonable" application of federal law or determination of facts. *Williams v. Taylor*, 529 U.S. at 410 ("[t]he term 'unreasonable' is no doubt difficult to define"). As the Supreme Court has made clear, however, an incorrect state court determination is not necessarily an unreasonable one. *Id.* ("the most important point is that an unreasonable application of federal law is different from an *incorrect* application of federal law")(emphasis in original). It is well-settled that "a federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application [or determination] must also be unreasonable." *Id.* at 411. This same standard should be applied to determine whether a state court's decision was based on "an unreasonable determination of the facts in light of the

evidence presented in the State court proceeding" under 28 U.S.C. § 2254(d)(2).  *See Torres*, 223

F.3d at 1108 (reasonableness standards under § 2254(d)(1) and (d)(2) are the same).

     **B.**     **The Massachusetts Appeals Court's Decision on the Claims Advanced in**
               **Grounds One through Three of the Petition Was Neither Contrary To, Nor**
               <u>**an Unreasonable Application of, Established Federal Law**</u>

           1.     The Petitioner Is Not Entitled to Habeas Relief on Ground One of His
                 Habeas Petition Because this Claim Was Decided on an Issue of State
                 Law <u>Which Cannot Form the Basis for Habeas Relief.</u>

       The petitioner claims, in Ground One of his habeas petition, that his conviction was

obtained in violation of his rights to a fair trial and due process of law because the trial court

admitted into evidence a statement which the petitioner had made prior to the confrontation

which resulted in the victim's death.  The petitioner claims that admission of the statement was

error because the statement constituted evidence of prior misconduct and the statement's

relevance, if any, was outweighed by the prejudicial nature of the statement. *See* Petitioner's

Memorandum, pp. 25-26. This claim must be denied, however, because the court's ruling on the

admissibility of the statement was a question of state law, and matters of state law cannot furnish

the basis for federal habeas relief.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S.Ct. 475,

116 L.Ed.2d 385 (1991); *Lewis v. Jeffers*, 497 U.S. 764, 780, 110 S.Ct. 3092, 111 L.Ed.2d 606

(1990).

       Errors of state law do not provide a basis for federal habeas corpus relief.  *Estelle*, 502

U.S. at 67-68; *Lewis*, 497 U.S. at 780.  It is not the province of a federal habeas court to

reexamine state court determinations of state law questions.  *Lewis*, 497 U.S. at 780-81.  In other

words, this Court does not have jurisdiction in the federal collateral attack of the petitioner's

state court conviction to review a claimed error of a State's evidentiary law.   A federal court

may issue a writ of habeas corpus only when a conviction violates the constitution, laws, or treaties of the United States. *Estelle*, 502 U.S. at 67-68; 28 U.S.C. §§ 2241, 2254. "Even if an error of state law could be sufficiently egregious to amount to a denial of equal protection or of due process of law guaranteed by the Fourteenth Amendment," a federal court may not issue a writ to redress such a deprivation if the claims are merely ancillary to perceived errors of state law. *Pulley v. Harris*, 465 U.S. 37, 41, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). *See also Adelson v. DiPaola*, 131 F.3d 259, 262 n.3 (1st Cir. 1997); *Hamm v. Latessa*, 72 F.3d 947 (1st Cir. 1995), *cert. denied*, 519 U.S. 947 (1996); *Pitts v. Lockhart*, 911 F.2d 109, 111-12 (8th Cir. 1990), *cert. denied*, 501 U.S. 1253 (1991)(petitioner's claims that he was deprived of due process and equal protection were not grounds for habeas relief where his conviction was obtained in contravention of state law, no matter how "serious and fundamental the error" may have been).

In this case, the petitioner claims that the trial court's admission of his statement was error because it constituted evidence of prior misconduct, which should not have been admitted. *See* Petitioner's Memorandum, pp. 25-26. The petitioner also argues that the statement should have been excluded because it was not relevant and "any minimal probative value was greatly outweighed by 'its prejudicial potential.'" *Id*. However, the question of whether the evidence was properly admitted under the Massachusetts law of evidence is not the question before a federal habeas court; rather, federal review is limited to the question of whether admitting the evidence violated the petitioner's constitutional rights. *See Oliver v. Wood*, 96 F.3d 1106, 1108 (8th Cir. 1996)("We will not re-examine whether evidence was properly admitted under state law . . . . Rather, we consider only the question whether [the petitioner's] conviction was obtained in violation of the United States Constitution); *Jennings v. Maynard*, 946 F.2d 1502,

22

1505 (10th Cir. 1991).

Here, the petitioner does not allege -- nor could he -- that the admission of his statement which he had made prior to the confrontation with the victim violated any constitutional right other than due process. *See* Petitioner's Brief, pp. 25-27.  Accordingly, the decision as to whether to admit the testimony about the statement was a question of state law purely within the discretion of trial judge.  The Appeals Court affirmed the trial court's ruling, stating:

> The [petitioner] claims that the judge erred by admitting, over objection, evidence of his statement, made about two hours after an argument with the deceased and about a half-hour before the killing, that "they were going to see that one of these days he was going to kill one of those guys."  The statement was relevant to the question of his intent to kill.  *See Commonwealth v. Rancourt*, 399 Mass. 269, 275 (1987).  Whether the statement was directed at the deceased was a question for the jury.  The jury could reasonably infer that the [petitioner] was referring to the deceased based upon evidence of the argument earlier that evening, the absence of any other argument in the interim, and the fact that the [petitioner] and the deceased had a similar argument one or two weeks before.  *See Commonwealth v. Hicks,* 22 Mass. App. Ct. 139, 142 (1986).  There was no error.

*Commonwealth v. Rodriguez,* 48 Mass. App. Ct. at 1050, Supp. Ans., Exhibit 5.

The decision to admit the petitioner's statement was a matter of state evidentiary law, not implicating the Constitution.  While the petitioner is correct that he has a right to a fair trial and to due process as guaranteed by the constitution, he overlooks the fact that these rights do not "abrogate the trial judge's role as gatekeeper at trial."  *See Neverson v. Bissonnette,* 242 F.Supp.2d 78, 86 (D.Mass. 2003).  Massachusetts law requires that a trial judge acts as a gatekeeper "to determine whether testimony is relevant, probative, and not unfairly prejudicial." *See id, citing Anthony's Pier Four, Inc. v. HBC Associates*, 411 Mass. 451, 477, 583 N.E.2d 806 (1991); *Commonwealth v. D'Agostino*, 344 Mass. 276, 279, 182 N.E.2d 133 (1962); *Commonwealth v. Burke*, 339 Mass. 521, 534, 159 N.E.2d 856 (1959), *overruled on other*

23

*grounds by Commonwealth v. Beldotti*, 409 Mass. 553, 567 N.E.2d 1219 (1991). *See also Commonwealth v. Kirkpatrick,* 423 Mass. 436, 447-48, 668 N.E.2d 790, 797 (1996); *Commonwealth v. Benoit*, 410 Mass. 506, 520, 574 N.E.2d 347, 355 (1991); *Commonwealth v. United Books, Inc.,* 389 Mass. 888, 895-96, 453 N.E.2d 406, 415 (1983).

The petitioner does not cite any Supreme Court case which suggests that the Appeals Court's ruling runs afoul of clearly established federal law. The ruling cannot, therefore, form the basis of a claim for federal habeas relief. *See Salemme v. Ristaino*, 587 F.2d 81, 85 (1st Cir. 1978) ("[h]abeas relief is unavailable to persons solely on the basis of alleged errors in evidentiary rulings").[10]

> 2.    The Appeals Court's Decision on the Closing Argument Claim Was Not Contrary
>       to or an Unreasonable Application of Established Supreme Court Precedent.

The petitioner claims that his constitutional due process rights were violated by the fact that the prosecutor commented on a witness' testimony during his closing argument. The Appeals Court considered and rejected this claim, stating:

> A prosecution witness, who also was a close friend of the [petitioner] testified that the [petitioner] told her that "they or he shouldn't have been messing with him." She couldn't remember whether it was "he" or "they." In his closing argument, the prosecutor implied that the [petitioner] had said "he," and that the witness's claimed failure of memory was a bias toward the [petitioner], with whom she visited a week before trial wherein they discussed events leading up to the killing. The prosecutor's argument was a fair comment based on the witness' testimony. *See Commonwealth v. Delaney*, 425 Mass. 587, 600-601 (1997), *cert. denied*, 522 U.S. 1058 (1998); *Commonwealth v. Vaughn*, 43 Mass. App. Ct. 818, 824-826 (1997). There was no

---

[10] Because the petitioner did not present the constitutional basis of his claim to the SJC, his claim is also unexhausted, which provides further grounds to deny relief on Ground One of the habeas petition. *See Mele v. Fitchburg District Court,* 850 F.2d 817, 819 (1st Cir. 1988)*; see also Rose v. Lundy,* 455 U.S. 509, 518-19 (1982); *Scarpa v. DuBois,* 38 F.3d 1, 6 (1st Cir. 1994), *cert. denied* 513 U.S. 1129 (1995)*; Gagne v. Fair*, 835 F.2d 6, 7 (1st Cir. 1987).

error.

*Commonwealth v. Rodriguez*, 48 Mass. App. Ct. at 1050, Supp. Ans., Exhibit 5.

As is explained in section IIA, above, because there is no dispositive Supreme Court decision governing such a claim, relief may be granted only if the Appeals Court's decision was an objectively "unreasonable application" of generally relevant Supreme Court precedent. *Williams v. Taylor*, 529 U.S. at 411.  The petitioner has not made, and cannot make, such a showing.

The petitioner cites the Supreme Court case of *Berger v. United States,* 295 U.S. 78, 88-89 (1935), in support of his contention that the prosecutor's closing argument violated his right to due process.  In *Berger*, the Supreme Court reversed a conviction because of "pronounced and persistent" misconduct by the federal prosecutor, including a closing argument in which the prosecutor was "undignified and intemperate" and made "improper insinuations and assertions calculated to mislead the jury." *Id*. at 85, 89.  *Berger* does not, however, rest upon, or even mention, the Constitution or the Due Process Clause of either the Fifth or Fourteenth Amendments.  Instead, it constitutes an exercise by the Supreme Court of its supervisory powers over prosecutions in the lower federal courts, and does not purport to set a standard of habeas review of convictions obtained in the courts of the states.  *See Berger,* 295 U.S. at 85-89.  In any event, the prosecutor's characterization of the witness' testimony in this case cannot be said to even approach the "pronounced and persistent" misconduct cited in the *Berger* case. *Compare* Transcript Volume IV, pages 49-50 *with Berger*, 295 U.S. at 85, 89.

The Supreme Court cases which most directly apply to the petitioner's claim are *Darden v. Wainwright*, 477 U.S. 168 (1986), and *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974).

25

These cases stand for the proposition that statements made by state prosecutors during closing arguments may be so prejudicial as to violate a defendant's right to due process and a fair trial, and may thus warrant habeas relief.  In *DeChristoforo*, the Supreme Court affirmed the decision of the Massachusetts Supreme Judicial Court in *Commonwealth v. DeChristoforo*, 360 Mass. 531 (1971), that two statements made by the prosecutor during closing argument did not deny due process to the defendant.[11]  The Supreme Court held, however, that a federal court's habeas review of claims of prosecutorial misconduct is

> the narrow one of due process, and not the broad exercise of supervisory power that it would possess in regard to its own trial court   We regard this observation as important for not every trial error or infirmity which might call for an application of supervisory powers correspondingly constitutes a "failure to observe that fundamental fairness essential to the very concept of justice."

*DeChristoforo*, 416 U.S. at 642, quoting *Lisenba v. California*, 314 U.S. 219, 236 (1941).  The Supreme Court went on to state that a federal court may only overturn a state conviction, despite "undesirable, erroneous, or even universally condemned" conduct, *only* when such error violated some right guaranteed to the defendant by the Fourteenth Amendment.[12]  *Id.* at 642-43, quoting *Cupp v. Naughten*, 414 U.S. 141, 146 (1973).

In *Darden*, the Supreme Court held that a series of offensive statements by a Florida state prosecutor in his closing argument, although "undoubtedly improper" and deserv[ing of] the

---

[11] In the first statement, the prosecutor expressed his personal belief that the defendant was guilty, and in the second statement the prosecutor arguably conveyed the false impression that the defendant had unsuccessfully sought to plead guilty to a lesser charge.  *DeChristoforo*, 416 U.S. at 639, 640.

[12] In other words, conduct by a prosecutor which might have constituted reversible error had it occurred in a federal trial is not necessarily grounds to sustain a claim made in a habeas proceeding arising out of the identical conduct of a state prosecutor. *See Heald v. Mullaney*, 505 F.2d 1241, 1244-47 (1st Cir. 1974), *cert. denied*, 420 U.S. 955 (1975).

condemnation [they have] received from every court to review [them]," did not render the trial fundamentally unfair and thus did not violate the petitioner's right to due process.[13]  477 U.S. at 181-83.  Noting that "it is not enough that the prosecutors' remarks were undesirable or even universally condemned," and that under *DeChristoforo* the appropriate standard of review was "the narrow one of due process, and not the broad exercise of supervisory power," the Court "agree[d] with every other court to consider these comments that they did not deprive petitioner of a fair trial." *Id.* at 181; *see also Smith v. Phillips*, 455 U.S. 209, 219, 221 (1982)("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor . . . .  Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimensions.").

In the instant case, the Massachusetts Appeals Court properly applied the standard articulated in *Darden* and *DeChristoforo*.  *See Commonwealth v. Rodriguez*, 48 Mass. App. Ct. at 1050, Supp. Ans., Exhibit 5.  The Appeals Court considered what the trial testimony had been and what the prosecutor had said in his closing, and determined that "[t]he prosecutor's argument was a fair comment based on the witness' testimony." *Id.*  Since the Appeals Court's decision is supported by the record and is not arbitrary or objectively unreasonable, this Court may not grant habeas relief based on this claim. *See McCambridge*, 303 F.3d at 36-37.

     3.    The Appeals Court's Decision Regarding the Petitioner's Claims about the Reasonable Doubt and Manslaughter Jury Instructions Was Neither Contrary to

---

[13] The prosecutor made what the Supreme Court called "several offensive comments reflecting an emotional reaction to the case," including, but not limited to, the statement "He shouldn't be out of his cell unless he has a leash on him and a prison guard at the other end of that leash." *Darden*, 477 U.S. at 180 & n. 12.

<u>Nor an Unreasonable Application of Established Supreme Court Precedent.</u>

In Ground Three of his petition, the petitioner claims that his due process rights were violated by allegedly flawed jury instructions on the issues of reasonable doubt and manslaughter. *See* Petitioner's Memorandum, pp. 33-37.  The Appeals Court rejected the petitioner's claims regarding the jury instructions, stating:

> The [petitioner] next challenges the judge's reasonable doubt and manslaughter instructions, which we review for the creation of a substantial risk of a miscarriage of justice, no objection having been made at trial.  The reasonable doubt charge was nearly verbatim from *Commonwealth v. Webster*, 5 Cush. 295, 320 (1850), which comports with constitutional standards. *See Commonwealth v. Lattimore*, 423 Mass. 129, 140 (1996).  The reference to an absolute or mathematical certainty was proper. *See Commonwealth v. James*, 424 Mass. 770, 788 (1997).   There was no error, hence no risk of a miscarriage of justice.
>
> The [petitioner's] list of shortcomings in the manslaughter instruction has been addressed in recent decisions, as set forth in the Commonwealth's brief at pages 34 to 41.  There was no error in that instruction.

*Commonwealth v. Rodriguez*, 48 Mass. App. Ct. at 1050, Supp. Ans., Exhibit 5.[14]

     *a.     Introduction*

 Since jury "[i]nstructions in a state trial are a matter of state law to which substantial deference is owed," allegedly improper jury instructions generally do not "form the basis for federal habeas corpus relief."  *Niziolex v. Ashe*, 694 F.2d 282, 290 (1st Cir. 1982) (citations omitted).  Habeas relief is proper only where "'the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."  *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).  In making this determination, the challenged instruction (or the allegedly omitted instruction) must be viewed in the context of

---

[14] Because there was no objection to the reasonable doubt instruction at trial, the claim regarding this jury instruction is procedurally defaulted. *See* Section I, *supra*.

the entire trial and the jury instructions taken as a whole, *Mayfield v. Maloney*, 749 F. Supp.

1151, 1159 (D. Mass.), *aff'd*, 923 F.2d 839 (1st Cir. 1990), to determine "whether there is a

reasonable likelihood that the jury has applied the challenged instruction" in an unconstitutional

manner such that there exists a substantial risk of a miscarriage of justice. *Estelle*, 502 U.S. at 72

(quoting *Boyde v. California*, 494 U.S. 370, 380 (1990)); *McCambridge v. Hall*, 94 F. Supp. 2d

146, 154 (D. Mass. 2000) (resolution of a potentially erroneous instruction depends upon how a

reasonable juror could have interpreted the instruction) (citing *Sandstrom v. Montana*, 442 U.S.

510, 514 (1979)).

> *b.     Reasonable Doubt Jury Instruction*

A reasonable doubt instruction violates the Due Process Clause only when there is a

reasonable likelihood that the jury actually understood the instructions to allow conviction based

on proof insufficient to meet the beyond-a-reasonable-doubt standard required by *In re Winship*,

397 U.S. 358 (1970).  *Victor v. Nebraska*, 511 U.S. 1, 6 (1994), citing *Estelle v. McGuire*, 502

U.S. 62, 72 & n.4 (1991)(possibility that jury "could have" applied instruction in

unconstitutional manner insufficient to set aside guilty verdict).  Under the AEDPA standard,

habeas relief is only available to the petitioner if he is able to show that the Appeals Court's

decision that the reasonable doubt instruction given at his trial did not violate his right to a fair

trial was an unreasonable application of the principles set forth in the *Victor* case.  *See Williams*

*v. Taylor,* 529 U.S. at 411.

Here, the trial judge's reasonable doubt instruction was, as the Appeals Court noted,

"nearly verbatim from *Commonwealth v. Webster*, 5 Cush. 295, 320 (1850), which comports

with constitutional standards."[15] *Commonwealth v. Rodriguez*, 48 Mass. App. Ct. at 1050, Supp.

Ans., Exhibit 5. The case cited by the Appeals Court refers to and incorporates the standard set

forth in the *Victor* case. *See id.; see also Commonwealth v. Lattimore*, 423 Mass. 129, 140

(1996). There can be, therefore, no argument that the Appeals Court's decision was contrary to

or an unreasonable application of clearly established federal law, and the petitioner is not entitled

to habeas relief on Ground Two of his petition.

        *c.*      *Manslaughter Jury Instruction*

       The petitioner also alleges that the manslaughter instruction to the jury was

constitutionally deficient because it incorrectly stated the standard for "provocation" which

would justify a finding that a killing was voluntary manslaughter (rather than murder). *See*

Petitioner's Brief, pp. 33-35. The Appeals Court determined, however, that the manslaughter

charge was sufficient under Massachusetts law. *See Commonwealth v. Rodriguez*, 48 Mass. App.

Ct. at 1050, Supp. Ans., Exhibit 5. This legal determination is not open for review in these

proceedings and must be accepted as correct. *See Lewis v. Jeffers*, 497 U.S. 764, 780-81 (1990)

(it is not the province of a federal habeas court to reexamine state court determinations of state

law questions).

       The only question which remains, then, is whether the state-court determination of the

sufficiency of the manslaughter instruction was "contrary to" or an "unreasonable application" of

"clearly established Federal law, as determined by the Supreme Court of the United States." 28

U.S.C. § 2254(d)(1). There is no Supreme Court precedent directly on point. *See Beck v.*

---

       [15] The trial judge's jury instruction on reasonable doubt is reproduced in the trial
transcript at Volume IV, pages 63-64.

*Alabama*, 447 U.S. 625, 638 n.14 (1980) (expressly declining to consider whether the Due

Process Clause requires a lesser included offense instruction in noncapital cases).  Therefore, the

state court determination of this issue could not be "contrary to" any clearly established Supreme

Court precedent.  *See O'Brien*, 145 F.3d at 25 ("If no Supreme Court precedent is dispositive of

a petitioner's claim, then, *a fortiori*, there is no specific rule to which the state court's decision

can be 'contrary.'").

      Nor was the state court determination of this issue an "unreasonable application" of

Supreme Court precedent.  The petitioner does not point to any Supreme Court case, nor could

he, which says that providing a jury instruction on manslaughter which has been found to be

adequate as a matter of state law can give rise to a due process claim.  In this circuit, even the

complete failure to give a lesser included offense instruction in a non-capital case "'rarely, if

ever, presents a constitutional question.'"  *Tata v. Carver*, 917 F.2d 670, 672 (1st Cir. 1990)

(quoting *Pitts v. Lockhart*, 911 F.2d 109 (8th Cir. 1990), *cert. denied*, 501 U.S. 1253 (1991)).  It

is only where the "failure to give a lesser included offense instruction threatens a fundamental

miscarriage of justice" that habeas relief may be appropriate.  *Tata*, 917 F.2d at 672.  No such

threat is presented here.

      Moreover, as already noted, the Appeals Court determined that the trial judge gave a

manslaughter instruction which was legally sufficient and proper under Massachusetts law.

Supp. Ans., Exhibit 5.  This determination was not objectively unreasonable, particularly in view

of the totality of the jury instructions on manslaughter.  *See* Transcript Volume IV, pages 79-81,

92.  *See also United States v. Noone*, 913 F.2d 20, 29-30 (1st Cir. 1990) (no reversible error in

failing to give requested instruction where jury charge, as a whole, covered the issues), *cert.*

*denied*, 500 U.S. 906 (1991); *Commonwealth v. Anderson*, 486 N.E.2d 19, 25 (Mass. 1985) (same). The petitioner points to no Supreme Court case to which casts doubt on the constitutionality of the Appeals Court's decision. Therefore, since Appeals Court's decision was not contrary to or an unreasonable application of established Supreme Court precedent, habeas relief on Ground Three should be denied.

## CONCLUSION

For the foregoing reasons, the respondent respectfully requests that this Court deny the habeas petition before it and dismiss the petitioner's case.

> Respectfully submitted,
>
> MCI NORFOLK,
>
> By its attorney,
>
> THOMAS F. REILLY,
> ATTORNEY GENERAL
>
>
> /s/ Maura D. McLaughlin
> Maura D. McLaughlin
> Assistant Attorney General
> Criminal Bureau
> One Ashburton Place
> Boston, Massachusetts 02108
> (617) 727-2200, ext. 2857
> BBO # 634923

Dated: June 15, 2005

**CERTIFICATE OF SERVICE**

I hereby certify that I have this 15th day of June, 2005, served a true and accurate copy of the foregoing pleading on the petitioner, Jose Rodriguez, by depositing a copy in the office repository for collection and delivery by first class mail, postage prepaid, to the petitioner at the following address: Jose Rodriguez, Prisoner No. W63370, M.C.I. Norfolk, Post Office Box 43, Norfolk, Massachusetts, 02056.


/s/ Maura D. McLaughlin
Maura D. McLaughlin

33